927 F.2d 1473
 19 Fed.R.Serv.3d 952, 33 Fed. R. Evid. Serv. 825
 John DAVIS; Wayne Broughton, a minor, through his guardian
and mother Sharon Broughton; Doug Durbin; Ed
Rodius, and Don Taylor,
Plaintiffs-Appellees-Cross-Appellants,
v.
MASON COUNTY; Mason County Sheriff's Department; Pete
Cribben, in his capacity as a Mason County Deputy Sheriff
and as an individual; Jack Gardner, in his capacity as a
Mason County Deputy Sheriff and as an individual; Susan
Gardner, his wife, and the martial community composed
thereof; Garry Ohlde, in his capacity as a Mason County
Deputy Sheriff and as an individual; Doug Quantz, in his
capacity as a Mason County Deputy Sheriff and as an
individual, and; Ray Sowers, in his capacity as a Mason
County Deputy Sheriff and as an individual,
Defendants-Appellants-Cross-Appellees.
 Nos. 88-3947, 88-4394 and 88-3951.
 United States Court of Appeals,
Ninth Circuit.
 Argued, Submission Deferred Dec. 4, 1989.
Resubmitted Dec. 13, 1989.
Decided March 12, 1991.
As Amended May 6, 1991.
As Amended June 6, 1991.
 
 Nancy K. McCoid, Merrick, Hofstedt and Lindsey, Seattle, Wash., for defendants-appellants.
 Timothy K. Ford, Kathleen Wareham, MacDonald, Hoague & Bayless, Seattle, Wash., Robert Wilson-Hoss, Hoss & Wilson-Hoss, Shelton, Wash., for plaintiffs-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before WALLACE, Chief Judge, PREGERSON and NELSON, Circuit Judges.
 PREGERSON, Circuit Judge:
 
 
 1
 Mason County, its sheriff and several deputies appeal from a jury verdict finding them liable under 42 U.S.C. Sec. 1983 for damages for excessive force used while arresting citizens in four separate incidents. We affirm the jury verdict and find municipal liability of Mason County and the Sheriff's Department.
 
 BACKGROUND
 
 2
 Each of the plaintiffs-appellees' complaints arose out of traffic stops which resulted in arrests, beatings, and false charges that were later dropped. The incidents occurred within a nine-month period between June, 1985 and March, 1986.
 
 A. The Durbin Incident
 
 3
 Early on the morning of June 29, 1985 as Doug Durbin returned home from a local tavern, Deputy Ray Sowers followed him and waited outside of Durbin's home. Deputy Tom Furrer later arrived as backup. Sowers, flicking an electric stun gun on and off, ordered Durbin out of his house. Durbin, who complied, was arrested for drunk driving. After taking one step toward his house, the two deputies tackled Durbin and threw him to the ground. Though Durbin never attempted to resist, Sowers began to beat him on the back of his head with his fist. In the patrol car on the way to the jail Sowers slammed on the brakes, causing Durbin, who was handcuffed and thus defenseless, to smash into the screen with his face.
 
 
 4
 Durbin was charged with driving while intoxicated[1], resisting arrest and obstructing an officer. Yet after Durbin signed a "Release and Satisfaction" against Mason County, the charges against him were dismissed.
 
 B. The Taylor Incident
 
 5
 Deputy Doug Quantz pulled over Don Taylor as he was driving through Shelton on the afternoon of July 20, 1985, allegedly for driving too fast. Quantz ordered Taylor to spread-eagle against the patrol vehicle and proceeded to conduct a pat-down search. Under the guise of this search, Quantz twisted the skin on Taylor's arms and legs, struck him on the sides, hit him in the testicles, and slammed him against the side of the patrol car. Later, in the jail elevator, Quantz hit Taylor in the kidneys with his fist.
 
 
 6
 After signing a "Partial Covenant Not to Sue," promising not to bring charges against Mason County, the charges against Taylor, including reckless driving, obstructing an officer, and resisting arrest, were dropped.
 
 C. The Davis/Broughton Incident
 
 7
 John Davis and his fifteen year-old nephew, Wayne Broughton, were driving a loaded hay wagon drawn by a team of four horses on the afternoon of July 28, 1985. Because some cars were slowed behind the wagon, Deputy Jack Gardner came alongside the wagon in his patrol vehicle and, using his loudspeaker, ordered Davis to pull over. Davis lost control over the horses, who had been frightened by the noise of the loudspeaker. Gardner pulled in front of the wagon, took out his gun, pointed it at Davis and Broughton and threatened to shoot if they did not stop. As Davis got down from the wagon to attend to his horses, Gardner beat him on the legs with his nightstick and struck him on the head. He then knocked him down to the ground and continued to beat him. After Deputies Pete Cribben and Garry Ohlde arrived at the scene, all three hit him, kicked him, and shocked him with an electric stun gun. According to one witness, Davis "looked like he had been dipped in a bucket of blood" after the officers finished beating him.
 
 
 8
 Deputy Gardner's wife, who had been riding with him as a passenger and who was not an officer, ordered Broughton down from the wagon, and then took him by the arm and put him in the patrol car. After being questioned for an hour, Broughton was released.
 
 
 9
 Davis was arrested and charged with felony assault, resisting arrest and obstructing an officer. The misdemeanor charges were dismissed, and a jury, which found that Davis was acting in self-defense, acquitted him of the felony charge.
 
 D. The Rodius Incident
 
 10
 When Deputy Ray Sowers observed four young people talking between a car and a truck on the evening of March 15, 1986, he pulled over both vehicles. Sowers ordered Ed Rodius, a passenger in the truck, into the patrol car after he asked why they had been stopped. When Rodius refused to comply, Sowers jumped on Rodius, choked him, pulled on his hair, and then threw him to the ground and rubbed his face on the gravel of the parking lot.
 
 
 11
 Rodius was arrested and charged with possession of alcohol as a minor, purchasing liquor, and resisting arrest. Rodius was tried twice on the resisting arrest charge. The first trial resulted in a hung jury, and the second was declared a mistrial after the prosecution violated a motion in limine by referring to the case at bar in front of the jury. The Mason County Prosecutor's office eventually dismissed the charges.
 
 
 12
 In the present case, the jury returned verdicts against all the individual deputies and the County, awarding $528,000 in compensatory Punitive damages were awarded only against the individual deputies, not the County. The jury awarded $225,000 in punitive damages and $150,000 compensatory to Davis; $10,000 in punitive and $5,000 compensatory to Broughton; $25,000 in punitive and $5,000 compensatory to Durbin; $25,000 in punitive and $0 compensatory to Rodius; and $35,000 in punitive and $1,500 compensatory to Taylor. The district court awarded attorneys' fees, expenses, and costs to plaintiffs in the amount of $323,559.65.
 
 
 13
 Defendants-appellants timely appealed. This court has jurisdiction over the appeal under 28 U.S.C. Sec. 1291.
 
 DISCUSSION
 
 14
 I. Whether the district court erred in denying defendants'
 
 
 15
 motion to sever.
 
 
 16
 Defendants-appellants (collectively "Mason County") argue that the district court erred in denying their motion to sever. This argument is based on two theories. First, they contend that the requirements for permissive joinder were not met. Second, they maintain that even if the requirements for permissive joinder were met, the motion to sever the plaintiffs' claims should have been granted because not doing so resulted in prejudice to the individual defendants.
 
 
 17
 Federal Rule of Civil Procedure 42(b) gives a district court broad discretion to order separate trials. A district court's decision regarding severance may be set aside only for abuse of discretion. United States v. Sanchez-Lopez, 879 F.2d 541, 551 (9th Cir.1989). Under the abuse of discretion standard, a reviewing court cannot reverse unless it has a definite and firm conviction that the district court made a clear error of judgment in its conclusion. Abatti v. Commissioner, 859 F.2d 115, 117 (9th Cir.1988).
 
 A. Permissive Joinder
 
 18
 Mason County did not raise the issue of whether the requirements for permissive joinder were met below. They are thus precluded from raising it now. This court will not "review an issue not raised below unless necessary to prevent manifest injustice." International Union of Bricklayers and Allied Craftsman Local Union No. 20 v. Martin Jaska, Inc., 752 F.2d 1401, 1404 (9th Cir.1985). This court will address the issue only if the proponent can point to "exceptional circumstances why the issue was not raised below." Id. (quoting Taylor v. Sentry Life Ins. Co., 729 F.2d 652, 655-56 (9th Cir.1984) (per curiam)). Because Mason County does not show any reasons why they failed to raise the issue below, this court will not consider the issue.
 
 B. Prejudice to the Defendants-Appellants
 
 19
 Mason County moved before trial to sever the claims of the plaintiffs because, they argued, joinder would result in prejudice to the individual defendants. It is true that by trying the claims against the individual defendants with the claims against Mason County and the Sheriff's Department, evidence of the series of incidents of excessive force involving different police officers which would have been inadmissible against individual defendants not involved in the particular episode, were admissible against the County and the Sheriff's Department in order to show a pattern of misconduct.
 
 
 20
 Yet, while severing the defendants would have surely eliminated this prejudice, severing the plaintiffs would not have solved the problem. Even if each plaintiff had a separate trial, evidence of a pattern of misconduct would still have been admitted because each plaintiff (except Taylor who did not sue Mason County) presented a claim against at least one defendant and against the County. Since defendants requested severance of the plaintiffs' claims, the court below did not abuse its discretion in rejecting the motion.
 
 
 21
 II. Whether the district court erred in not granting a
 
 
 22
 directed verdict on the issue of municipal liability of
 
 
 23
 Mason County and the Sheriff's Department, and whether the
 
 
 24
 jury was properly instructed on the issue.
 
 
 25
 A directed verdict is proper if the court finds that the evidence and its inferences, viewed in the light most favorable to the non-moving party, permits only one reasonable conclusion as to the verdict. Peterson v. Kennedy, 771 F.2d 1244, 1256 (9th Cir.1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). A directed verdict "is inappropriate if there is substantial evidence to support a verdict for the non-moving party." Id. Jury instructions are reviewed for abuse of discretion. Maxwell v. Hapag-Lloyd Aktiengesellschaft, Hamburg, 862 F.2d 767, 768 (9th Cir.1988).
 
 
 26
 Plaintiffs sued the individual deputies, Mason County, and the Sheriff's Department for violation of their federal constitutional rights protected by the Fourth Amendment. Municipalities may be held liable under 42 U.S.C. Sec. 1983 for actions which result in a deprivation of constitutional rights. Monell v. New York City Dep't of Social Servs., 436 U.S. 658, 690, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). However, a municipality cannot be held liable on a respondeat superior theory. Id. at 691, 98 S.Ct. at 2036. Municipal liability is incurred under section 1983 only when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury...." Id. at 694, 98 S.Ct. at 2037.
 
 
 27
 The Supreme Court recently addressed the issue whether the inadequacy of police training may result in municipal liability under section 1983 in City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). In determining liability the Court said that the adequacy of the training program must be assessed in relation to the tasks the officers must perform. Id. at 390, 109 S.Ct. at 1205. Further, the failure to train must "reflect[ ] a 'deliberate' or 'conscious' choice by a municipality--a 'policy'...." Id. at 389, 109 S.Ct. at 1205.
 
 
 28
 A. Sheriff Nat Stairs was a policy-making official
 
 
 29
 To establish municipal liability under section 1983, it must be shown that the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered. Pembaur v. City of Cincinnati, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) (plurality opinion). Because "municipalities often spread policymaking authority among various officers," a particular officer may have authority to establish binding policy with respect to particular matters, but not others. Id. at 483, 106 S.Ct. at 1300. According to Washington law, in counties organized like Mason County, "[t]he sheriff is the chief executive officer and conservator of the peace of the county." Wash.Rev.Code Sec. 36.28.010 (1990). As chief executive officers, sheriffs possess final authority with respect to the training of their deputies, and thus it may be fairly said that their actions constitute county policy on the subject.
 
 
 30
 The dissent argues that "[f]inal authority for personnel administration does not rest with the county sheriff; rather it rests with the civil service commission." Dissenting opinion at 2630. This conclusion misses the point: the majority opinion holds that Mason County is liable as a matter of law for failing to train its officers on the constitutional limits of force--not for its hiring practices.
 
 
 31
 The purpose of the Washington Sheriff's Office Civil Service statute "is to establish a merit system of employment for county deputy sheriffs and other employees of the office of county sheriff...." Wash.Rev.Code Sec. 41.14.010; Fezzey v. Dodge, 33 Wash.App. 247, 249, 653 P.2d 1359, 1361 (1982). To this end, the Commission is empowered to make rules and regulations regarding "appointments, promotions, reallocations, transfers, reinstatements, demotions, suspensions, and discharges," along with "other matters connected with the general subject of personnel administration." Wash.Rev.Code Sec. 41.14.060(1). But nowhere does the statute extend the Commission's powers to the field of law enforcement, or specifically in this case, peace officer training. See Clallam County Deputy Sheriff's Guild v. Board of Clallam County Comm'rs, 92 Wash.2d 844, 847, 601 P.2d 943, 946 (1979) (en banc) ("A full reading of [Sec. 41.14 of the Revised Code of Washington] reveals that in its enactment the legislature intended to preempt the coverage by county personnel systems of deputy sheriffs' selection, promotion and termination.") (emphasis added).
 
 
 32
 Our holding is consistent with the Supreme Court's teachings in City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), and Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Both provide for municipal liability in the circumstances here. The example in Pembaur, reiterated in Praprotnik, bears repeating:
 
 
 33
 [T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability.
 
 
 34
 Id. at 483 n. 12, 106 S.Ct. at 1300 n. 12 (plurality opinion) (emphasis added); see Praprotnik, 485 U.S. at 140, 108 S.Ct. at 932 (Brennan, J., concurring).
 
 
 35
 This example explains that a Sheriff can be the official policymaker regarding law enforcement practices without having final authority over all of its employees' employment practices. This is the case here. The training of peace officers on the use of force is a type of law enforcement practice that falls squarely within the policymaking authority of a County Sheriff.
 
 
 36
 B. Jury instructions with respect to municipal liability
 
 
 37
 The trial judge instructed the jury that failure to train could serve as the basis of County liability if the County exhibited a "reckless disregard for" or a "deliberate indifference to" the safety of its inhabitants. The instructions given by the district court required a higher mental state than the "gross negligence" standard prescribed by this circuit at that time. See Bergquist v. County of Cochise, 806 F.2d 1364, 1369-70 (9th Cir.1986). The County did not object to the instructions. After trial, however, the Supreme Court held in City of Canton v. Harris that failure-to-train liability is proper "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. at 388, 109 S.Ct. at 1204.
 
 
 38
 Mason County now argues that it was reversible error to instruct on the "reckless disregard" standard for failure-to-train liability in addition to the "deliberate indifference" standard. We have held that where a jury instruction correctly stated the law of the circuit at the time it was given, yet subsequent authority changed the law, consideration on appeal is not barred by the fact that no exception was taken to the instruction at the time of trial. Robinson v. Heilman, 563 F.2d 1304, 1307 (9th Cir.1977). "No exception is required when it would not have produced any results in the trial court because a 'solid wall of Circuit authority' then foreclosed the point." Id. The rationale for this rule is that while district courts should not be burdened by objections to settled points of law, neither should parties be penalized for failing to object if this settled law is later overturned.
 
 
 39
 Bergquist is not, however, a "solid wall of Circuit authority" regarding the mental state sufficient to find failure-to-train liability. Although in Bergquist we did hold that a policy of gross negligence in training could give rise to a claim for section 1983 liability, we said that "[t]he Supreme Court expressly reserved the question whether 'something less than intentional conduct, such as recklessness or "gross negligence," is enough to trigger the protections of the Due Process Clause.' " Bergquist, 806 F.2d at 1370 (quoting Daniels v. Williams, 474 U.S. 327, 334 n. 3, 106 S.Ct. 662, 667 n. 3, 88 L.Ed.2d 662 (1986)). The Supreme Court subsequently answered this question in City of Canton. In Bergquist, by saying that the question was left open by the Supreme Court, we clearly indicated that the state of mind sufficient to find failure-to-train liability was not a settled point of law. Thus, the Robinson exception for waiving objections does not apply to the issue in this case. Mason County, having failed to object to the jury instruction, lost the right to raise this issue on appeal. Robert's Waikiki U-Drive, Inc. v. Budget Rent-A-Car Sys., Inc., 732 F.2d 1403, 1410 (9th Cir.1984).
 
 
 40
 Even if Mason County did object to the jury instruction regarding the standard for municipal liability, we still would hold that the district court did not commit reversible error. "We examine whether or not the instructions taken as a whole were misleading or represented a statement inadequate to guide the jury's deliberations." United States v. Kessi, 868 F.2d 1097, 1101 (9th Cir.1989). The instructions given by the district court allowed the jury to find municipal liability only upon a showing of "reckless disregard" or "deliberate indifference." We do not find the court's instructions, taken as a whole, to be inconsistent with the "deliberate indifference" standard enunciated in City of Canton. In City of Canton, the Court stated that "the need for more or different training [may be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent." 489 U.S. at 390, 109 S.Ct. at 1205.
 
 
 41
 Similarly, the district court in this case instructed that a person acts with reckless disregard when he "disregards a substantial risk that a wrongful act may occur of which he is aware, or which is so obvious that he must have been aware of it, and his disregard of that risk is a gross deviation from conduct that a reasonable person would exercise in the same situation." (Emphasis added). The district court's definition of reckless disregard is effectively the same as the language cited from City of Canton; both allow a jury to impose municipal liability in failure-to-train cases for acts that so clearly violate the rights of an individual that the policymakers can be said to be deliberately indifferent.
 
 
 42
 In fact, after City of Canton, two circuits have suggested that Sec. 1983 liability may be imposed on a municipality if it exhibits a "reckless disregard" for an individual's constitutional rights. See D.T. v. Independent School Dist. No. 16, 894 F.2d 1176, 1192-93 (10th Cir.) ("[u]nder the standard [for municipal liability] mandated by [City of Canton ] ... the evidence in this case is simply insufficient to demonstrate that the School District's policy reflected a reckless disregard or deliberate indifference ") (emphasis added), cert. denied, --- U.S. ----, 111 S.Ct. 213, 112 L.Ed.2d 172 (1990); Clipper v. Takoma Park, Maryland, 876 F.2d 17, 20-21 (4th Cir.1989) (reaffirming the "deliberate indifference to or reckless disregard to" standard used in Spell v. McDaniel, 824 F.2d 1380 (4th Cir.1987), cert. denied, 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988)). But see Calvert Ins. Co. v. Western Ins. Co., 874 F.2d 396, 400 n. 5 (7th Cir.1989) ("[a] recent Supreme Court case has held that an allegation of mere reckless failure to train does not state a cause of action against a municipality under Sec. 1983").
 
 
 43
 C. Failure-to-train liability as a matter of law
 
 
 44
 The jury instructions on this issue were nevertheless harmless because Mason County's failure to adequately train its deputies constituted deliberate indifference as a matter of law.
 
 
 45
 The training that the deputies received was woefully inadequate, if it can be said to have existed at all. Sheriff Stairs himself never attended the State Training Academy and Undersheriff Harry "Bud" Hays had neither training nor experience. Although Washington law requires all police officers to complete academy training within fifteen months of hire,[2] Deputy Sowers did not complete the academy until sixteen months after he was hired.
 
 
 46
 Instead of academy training, the Sheriff's Department devised a "field training program" for the officers. While this program may have seemed adequate on paper, in practice it was never followed. Indeed, one of the Department's two original field training officers, both of whom quit, called the program "a joke." The field training program was supposed to include tests, reports, and reviews by the field training officer and supervising sergeant on a periodic basis, yet there is no evidence that this was ever done. Although the program was supposed to last twelve months, in actuality it lasted only for a small fraction of that time.[3] One of plaintiffs' experts testified that as a result of the inadequacy of the field training program, the Department "sent officers out on the street to perform police services without any training whatsoever." The officers involved in these four incidents had received minimal or no training.
 
 
 47
 At the time of the Durbin incident (June 29, 1985), Sowers had not attended the State Academy. His only training besides minimal field training, which was cut short, consisted of the explorer cadets, a program in which teenagers with interest in law enforcement rode with officers. Deputy Quantz had received no training whatsoever prior to the Taylor incident (July 20, 1985).[4] Although Deputies Gardner and Ohlde had attended the State Academy prior to the Davis incident (July 28, 1985), Deputy Cribben had not. He had only received minimal police-type training in other contexts, such as a private security guard.
 
 
 48
 The issue is not whether the officers had received any training--most of the deputies involved had some training, even if it was minimal at best--rather the issue is the adequacy of that training. City of Canton, 489 U.S. at 390, 109 S.Ct. at 1205. More importantly, while they may have had some training in the use of force, they received no training in the constitutional limits of the use of force. The Supreme Court in City of Canton declared: if "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, ... the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. The Court went on to say in a footnote that "the need to train officers in the constitutional limitations on the use of deadly force can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." Id. at 390 n. 10, 109 S.Ct. at 1205 n. 10 (citation omitted).
 
 
 49
 In the case at bar, the deprivation of plaintiffs' Fourth Amendment rights was a direct consequence of the inadequacy of the training the deputies received. Mason County's failure to train its officers in the legal limits of the use of force constituted "deliberate indifference" to the safety of its inhabitants as a matter of law.[5] Moreover, there was certainly more than enough evidence presented regarding the inadequacy of training in order to survive Mason County's motion for a directed verdict on the issue of municipal liability.
 
 
 50
 III. Whether the district court erred in various rulings
 
 
 51
 related to the admission of evidence.
 
 
 52
 Defendants-appellants object to various of the district court's evidentiary rulings. A trial court has broad discretion in admitting and excluding expert testimony and its decisions will not be reversed unless "manifestly erroneous." Taylor v. Burlington N.R.R., 787 F.2d 1309, 1315 (9th Cir.1986). Thus, its evidentiary rulings are reviewed for an abuse of discretion. Roberts v. College of the Desert, 870 F.2d 1411, 1418 (9th Cir.1988). The admission or exclusion of evidence under Fed.R.Evid. 403 or 404 is reversible only for a clear abuse of discretion. Coursen v. A.H. Robins Co., 764 F.2d 1329, 1333, amended, 773 F.2d 1049 (9th Cir.1985).
 
 A. Testimony of Dr. Kevin Parsons
 
 53
 Mason County contends that the district court improperly excluded the testimony of one of their police experts, Dr. Kevin Parsons. A district court may exclude relevant, but cumulative evidence, because of "considerations of undue delay, waste of time, or needless presentation." Fed.R.Evid. 403. The court ruled that each side was free to call two experts to the stand. Mason County argues that the testimony of their third witness, Dr. Parsons, was necessary, not cumulative, because he "brought a different level of expertise and experience to the topic." But the County admitted that Sheriff Jones testified for them on the "same topic." The district court therefore did not abuse its discretion by excluding Dr. Parson's testimony as cumulative evidence.
 
 B. Testimony of Bryan Kelly and Mike Smith
 
 54
 Mason County maintains that the trial court erred in excluding the testimony of former Mason County deputies Bryan Kelly and Mike Smith regarding the Taylor arrest. However, the district court did grant the County's motion to include Kelly to its witness list; Mason County never called Kelly.
 
 
 55
 Smith was not listed as a witness in the pretrial order, and it was not until late in the trial that Mason County moved to include him. Not only would Smith's testimony have been cumulative, Mason County offered no compelling reasons to add him. Fed.R.Evid. 403 gives the district court broad discretion in excluding cumulative evidence. See Hamling v. United States, 418 U.S. 87, 127, 94 S.Ct. 2887, 2912, 41 L.Ed.2d 590 (1974). The district court did not abuse its discretion in excluding Smith's testimony.
 
 C. Testimony on the James Davies incident
 
 56
 The day before the Davis/Gardner incident, there was an altercation between John Davis and James Davies. Davies, allegedly drunk and annoyed at being caught behind Davis' wagon, attacked Davis' teenage son. In defending his son, Davis bloodied Davies' nose. Although Davis filed a police report reporting the incident, he did not press charges against Davies for initiating the attack, and the matter was dropped. Yet after the Davis/Gardner incident, the Sheriff's Department brought assault charges against Davis, who was acquitted in a jury trial.
 
 
 57
 Mason County sought to bring in evidence regarding this incident in order to show Davis' proclivity to violence. Fed.R.Evid. 404(b) says, however, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." See Coursen v. A.H. Robins Co., Inc., 764 F.2d at 1335. The trial court did not abuse its discretion in refusing to admit evidence of the Davies incident.
 
 D. Testimony of Donald Van Blaricom
 
 58
 Mason County objected to plaintiffs' police expert, Donald Van Blaricom, because he testified that Sheriff Stairs was reckless in his failure to adequately train his deputies, and that there was a causal link between this recklessness and plaintiffs' injuries. They contend that this was improper opinion testimony on a question of law.
 
 
 59
 This argument is without merit. Fed.R.Evid. 704 allows expert witnesses to express an opinion on an ultimate issue to be decided by the jury. Northrop Architectural Sys. v. Lupton Mfg. Co., 437 F.2d 889, 891 (9th Cir.1971). Moreover, Fed.R.Evid. 702 permits expert testimony comparing conduct of parties to the industry standard. Vucinich v. Paine, Webber, Jackson & Curtis, Inc., 803 F.2d 454, 461 (9th Cir.1986). The trial court did not abuse its discretion in admitting Van Blaricom's testimony.
 
 
 60
 IV. Whether there was sufficient evidence to support the
 
 
 61
 findings of punitive damages in the amount assessed.
 
 
 62
 The jury awarded punitive damages against the individual deputies totalling $320,000.[6] A jury may award punitive damages under section 1983 either when a defendant's conduct was driven by evil motive or intent, or when it involved a reckless or callous indifference to the constitutional rights of others. Smith v. Wade, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). Moreover, a plaintiff's inability to show compensable injury does not bar the award of punitive damages. Id. at 55 n. 21, 103 S.Ct. at 1639 n. 21.
 
 
 63
 Unless the amount of damages is grossly excessive, unsupported by the evidence, or based solely on speculation, the reviewing court must uphold the jury's determination of the amount. Los Angeles Memorial Coliseum Comm'n v. Nat'l Football League, 791 F.2d 1356, 1360 (9th Cir.1986), cert. denied, 484 U.S. 826, 108 S.Ct. 92, 98 L.Ed.2d 53 (1987).
 
 
 64
 The deputies make four arguments regarding the amount of punitive damages awarded. First, they argue that the punitive damages award should be stricken because there was insufficient evidence of any evil intent or motive. Second, they contend that the jury should have been instructed that their net worth should be considered in assessing punitive damages. Third, the deputies assert that because remedial measures were taken, punitive damages were unnecessary. Finally, they argue that since the jury awarded Rodius $0 in compensatory damages, he should not have been awarded punitive damages.
 
 A. Reckless or callous indifference
 
 65
 The deputies' argument that the punitive damages award should be stricken because there was insufficient evidence of evil intent or motive is completely without merit because the alternative basis for assessing punitive damages is "reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. at 56, 103 S.Ct. at 1640. The jury could certainly infer that there was "reckless or callous indifference" based upon the evidence presented of the excessive force used.
 
 B. Deputies' net worth
 
 66
 Plaintiffs concede that evidence of the deputies' net worth would have been relevant in assessing punitive damages. However, the deputies did not offer this evidence before the jury, and they did not object when the jury was not instructed on this issue. In order to preserve the issue on appeal, objections to jury instructions must be specific. Kopczynski v. The Jacqueline, 742 F.2d 555, 560 (9th Cir.1984), cert. denied, 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985). We will not consider the issue on appeal.
 
 C. Remedial measures
 
 67
 The deputies believe that the remedial measures taken rendered punitive damages unnecessary. Yet, they have failed to cite any Ninth Circuit case which supports this proposition. Further, punitive damages were assessed only against individual defendants. The jury obviously felt that the punitive damages were necessary to deter future unlawful and egregious behavior by the deputies. The jury's decision on this issue should stand.
 
 D. Compensatory damages
 
 68
 Rodius received $25,000 in punitive damages and $0 in compensatory damages. The deputies' argument that the jury erred in awarding punitive damages while not awarding compensatory damages fails. The Supreme Court has held that punitive damages may be available under Section 1983 where there has been a violation of constitutional rights even though the victim is unable to show compensable injury. Smith v. Wade, 461 U.S. at 55 n. 21, 103 S.Ct. at 1639 n. 21.
 
 
 69
 V. Whether there was sufficient evidence both to show that
 
 
 70
 Broughton had been seized and to support his state
 
 
 71
 law outrage claim.
 
 
 72
 The jury ruled that Broughton had been illegally seized when Deputy Gardner's wife ordered him down from the hay wagon, and then took him by the arm and put him in the patrol vehicle. Mason County claims that there is insufficient evidence to sustain the jury's verdict on this issue.
 
 
 73
 If the jury verdict is supported by "substantial evidence," the reviewing court must let it stand. "Substantial evidence" is admissible evidence that reasonable minds might accept as adequate to support a conclusion. Oltz v. St. Peter's Community Hosp., 861 F.2d 1440, 1450 (9th Cir.1988); Transgo, Inc. v. Ajac Transmission Parts Corp., 768 F.2d 1001, 1014 (9th Cir.1985), cert. denied, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). If sufficient evidence is presented to a jury on a particular issue and if the jury instructions on the issue stated the law correctly, the court must sustain the jury's verdict. Transgo, 768 F.2d at 1014.
 
 A. Jury instruction
 
 74
 The district court instructed the jury that "[a] person is seized within the meaning of the Fourth Amendment whenever a police officer restrains his or her freedom to walk or drive away." This instruction stated the law correctly. See Tennessee v. Garner, 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1985).
 
 
 75
 Moreover, there was certainly ample evidence from which the jury could infer that Deputy Gardner restrained Broughton's freedom to walk away. Broughton testified that he stayed on the wagon because he believed that Gardner would shoot. When Susan Gardner, the deputy's wife, ordered Broughton off the wagon and into the patrol car, he complied, thinking that she was a police officer as well. Broughton also testified that Susan Gardner forcibly took him by the arm and put him in the patrol car. From this evidence, it is clear that the jury could conclude that Broughton had been illegally seized.
 
 B. Broughton's emotional distress claim
 
 76
 Although Mason County argues that Broughton cannot state a claim for emotional distress because he has not exhibited any objective symptoms of emotional distress, Washington law does not require physical manifestations in order to make an emotional distress claim. Contreras v. Crown Zellerbach, 88 Wash.2d 735, 741 n. 2, 565 P.2d 1173, 1176 n. 2 (1977) (quoting Grimsby v. Samson, 85 Wash.2d 52, 59, 530 P.2d 291, 295 (1975)).
 
 
 77
 Further, the jury had to evaluate defendants' behavior in this incident and determine whether it was so outrageous as to go beyond bounds of decency. Spurrell v. Bloch, 40 Wash.App. 854, 701 P.2d 529, 535, review denied, 104 Wash.2d 1014 (1985). After hearing testimony from Dr. Beaton that Broughton suffered from post-traumatic stress syndrome as a result of seeing his uncle bloodied by the deputies and having a gun pointed at him, the jury decided in the affirmative the fact question of whether the defendants' behavior was "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency and be regarded as atrocious and utterly intolerable in a civilized community." Having so decided, the jury's verdict should stand.VI. Whether the district court erred in calculating
 
 
 78
 attorneys' fees.
 
 
 79
 A district court has broad discretion to grant attorneys' fees and costs. Thornberry v. Delta Air Lines, Inc., 676 F.2d 1240, 1242 (9th Cir.1982), vacated on other grounds, 461 U.S. 952, 103 S.Ct. 2421, 77 L.Ed.2d 1311 (1983). We review its decision only for an abuse of discretion. Id. "Due to the trial judge's familiarity with the litigation, review of the trial court's exercise of discretion in awarding attorneys' fees is narrow." Id.
 
 
 80
 Plaintiffs-appellees requested $575,658.13 in attorneys' fees and $99,201.63 in costs and expenses of litigation pursuant to the Attorney's Fees Awards Act of 1976, 42 U.S.C. Sec. 1988. The district court awarded $4,348.57 in costs pursuant to 28 U.S.C. Sec. 1920, and $249,588.00 in attorneys' fees and $69,623.08 in expenses of litigation under 42 U.S.C. Sec. 1988. Mason County contests the award of expert witness fees, travel expenses, and attorneys' fees.
 
 A. Expert Witness Fees
 
 81
 The district court granted $29,217.18 for plaintiffs' expert witnesses, the largest element of expenses awarded. Mason County argues that payment of expert witness fees as expenses is precluded by the Supreme Court's decision in Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). Crawford Fitting holds that "when a prevailing party seeks reimbursement for fees paid to its own expert witnesses, a federal court is bound by the limit of [28 U.S.C.] Sec. 1821(b), absent contract or explicit statutory authority to the contrary." 482 U.S. at 439, 107 S.Ct. at 2496.[7]
 
 
 82
 Plaintiffs originally contended that 42 U.S.C. Sec. 1988 provides statutory authority for awarding expert witness fees greater than those allowed under 28 U.S.C. Sec. 1821, a question left open in Crawford Fitting. See 482 U.S. at 445, 107 S.Ct. at 2499 (Blackmun, J., concurring) ("I join the Court's opinion and its judgment but upon the understanding that it does not reach the question whether, under 42 U.S.C. Sec. 1988, a district court may award fees for an expert witness."). In our opinion filed March 12, 1991, we held that, consistent with the majority of circuit courts to consider the issue, section 1988 allows a prevailing plaintiff to recover reasonable expert witness fees regardless of the limits of 28 U.S.C. Secs. 1821 and 1920.[8] But after the opinion was filed the Supreme Court in West Virginia University Hospitals, Inc. v. Casey, --- U.S. ----, 111 S.Ct. 1138, 113 L.Ed.2d 68 (March 19, 1991), reached the opposite conclusion. The Court held that "[42 U.S.C.] Sec. 1988 conveys no authority to shift expert fees." --- U.S. at ----, 111 S.Ct. at 1148.
 
 
 83
 In their motion to modify our March 12, 1991 opinion, plaintiffs now concede that, under Casey, the district court's award of expert witness fees cannot stand. Under Casey, the district court may not use section 1988 as a basis to award expert witness fees in excess of the limits imposed by 28 U.S.C. Secs. 1821 and 1920. We remand to the district court with instructions to modify the award of expert witness fees consistent with Casey.B. Travel Expenses
 
 
 84
 Mason County contends that costs other than expert witness fees should also be limited to those available under 28 U.S.C. Sec. 1920. The only costs disputed below were travel expenses. Because this court will not consider issues not raised below, our review will be limited to travel expenses. See Amalgamated Clothing & Textile Workers Union v. Murdock, 861 F.2d 1406, 1420 (9th Cir.1988).
 
 
 85
 Mason County fails to see that like the expert witness fees, the travel expenses were not granted as costs under section 1920, but rather as out-of-pocket expenses, compensable under section 1988. Courts have generally held that expenses incurred during the course of litigation which are normally billed to fee-paying clients should be taxed under section 1988. Dowdell v. City of Apopka, 698 F.2d 1181, 1190 (11th Cir.1983); Palmigiano v. Garrahy, 707 F.2d 636, 637 (1st Cir.1983); Northcross v. Board of Educ., 611 F.2d 624, 639 (6th Cir.1979), cert. denied, 447 U.S. 911, 100 S.Ct. 2999, 3000, 64 L.Ed.2d 862 (1980). As the Eleventh Circuit said in Dowdell:
 
 
 86
 Reasonable attorneys' fees under the [Attorney's Fees Awards] Act must include reasonable expenses because attorneys' fees and expenses are inseparably intertwined as equally vital components of the costs of litigation. The factually complex and protracted nature of civil rights litigation frequently makes it necessary to make sizeable out-of-pocket expenditures which may be as essential to success as the intellectual skills of the attorneys. If these costs are not taxable, and the client, as is often the case, cannot afford to pay for them, they must be borne by counsel, reducing the fees award correspondingly.
 
 
 87
 698 F.2d at 1190. Thus, following the reasoning adopted in upholding the award of expert witness fees, we also affirm the district court's award of travel expenses pursuant to section 1988.
 
 
 88
 However, it is unclear why the district court granted $12,845.25 for travel expenses as part of the $249,588.00 attorneys' fees, and $4,135.83 for travel expenses as part of the $69,623.08 award for expenses of litigation. Because the award of travel expenses may have been double-counted, we remand on this issue.
 
 C. Attorneys' fees
 
 89
 Mason County disputes the amount awarded in attorneys' fees. Specifically, they question whether $135/hour accurately reflected the prevailing market rate in Western Washington. Further, they argue that the award should have been adjusted for billing judgment and reduced to the extent plaintiffs did not prevail on their claims for injunctive relief.
 
 
 90
 First, the hourly rate granted was reasonable for the Western District of Washington. Plaintiffs submitted affidavits from the relevant community in support of their hourly fee request. Generally, the relevant community is one in which the district court sits. Polk v. New York State Dep't. of Correctional Servs., 722 F.2d 23, 25 (2d Cir.1983); Avalon Cinema Corp. v. Thompson, 689 F.2d 137, 140 (8th Cir.1982). Western Washington is the relevant community here, for it is where the court is located and where three of plaintiffs-appellees' attorneys practice. The court did not abuse its discretion in setting the hourly fees based on the prevailing rates there.
 
 
 91
 Second, the court did not abuse its discretion in determining the amount of the award. The trial court used the "lodestar" method of calculation in addition to the twelve-factor analysis. The "lodestar" figure is simply the multiplication of the number of hours reasonably expended by the reasonable hourly rate. Jordan v. Multnomah County, 815 F.2d 1258, 1262 (9th Cir.1987). The twelve factors, as outlined in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir.1974) and in Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir.1975), cert. denied, 425 U.S. 951, 96 S.Ct. 1726, 48 L.Ed.2d 195 (1976), include such considerations as the novelty of the case, the experience, reputation and ability of the attorneys, and the skill required to perform the legal service properly. After careful consideration of the twelve factors, the district court granted $249,588.00 in fees. There was no abuse of discretion.
 
 
 92
 Third, attorneys' fees should not be reduced to the extent that plaintiffs-appellees did not prevail on their claims for injunctive relief. Plaintiffs submitted an affidavit which attested to the minute amount of time actually spent on the injunction claim. Mason County did not produce any evidence in support of their assertion that plaintiffs spent "much of their time" working on the issue of injunctive relief. Moreover, "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.... In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." Hensley v. Eckerhart, 461 U.S. 424, 435, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983). There were excellent results in this case. The jury returned verdicts in favor of every plaintiff and against every defendant. Of the twenty basic verdicts in this case, plaintiffs prevailed on eighteen. We affirm the amount awarded in attorneys' fees.
 
 CONCLUSION
 
 93
 A jury found Mason County, its sheriff and several deputies liable under 42 U.S.C. Sec. 1983, and awarded damages to five plaintiffs who were arrested without probable cause, beaten and then subjected to false criminal charges by Mason County deputies. We hold that Mason County's failure to adequately train its officers in the constitutional limits of the use of force constituted deliberate indifference to the safety of its inhabitants as a matter of law. The jury's verdict is sustained. In addition, we remand to the district court to determine the proper accounting of travel expenses for plaintiffs' attorneys and of expert witness fees.
 
 
 94
 AFFIRMED.
 
 
 95
 WALLACE, Chief Judge, concurring in part and dissenting in part:
 
 
 96
 I have no quarrel with the majority opinion, except for its affirming liability against Mason County. In 1959, the Washington legislature enacted a comprehensive civil service system for the employment of sheriffs' deputies, creating a commission with the authority to make personnel policy and review its implementation. Washington courts have since repeatedly held this system superior to any supposed rights of county sheriffs over their personnel.
 
 
 97
 Nevertheless, from a statute naming the county sheriff its chief law enforcement officer, the majority concludes he is also the final policymaking authority for personnel training. The majority holds the entire civil service system irrelevant by inventing a distinction between "hiring" and "training," a distinction without basis in controlling Washington state law. I disagree, and because the case against Mason County turns on this point, I respectfully dissent.
 
 
 98
 * The jury found that constitutional deprivations had been inflicted under the color of law, see 42 U.S.C. Sec. 1983, and held liable the individuals involved. The jury also imposed liability on Mason County. Review of the county's liability, and the erroneous instructions that led to it, is the issue I address. We review jury instructions to determine "whether, considering the charge as a whole, the court's instructions fairly and adequately covered the issues presented, correctly stated the law, and were not misleading." Thorsted v. Kelly, 858 F.2d 571, 573 (9th Cir.1988).
 
 
 99
 Section 1983 does not impose vicarious municipal liability. Pembaur v. City of Cincinnati, 475 U.S. 469, 478, 106 S.Ct. 1292, 1297, 89 L.Ed.2d 452 (1986) (Pembaur ). Direct municipal liability is extremely limited, and applies only "to acts that are, properly speaking, acts of the municipality--that is, acts which the municipality has officially sanctioned or ordered." Id. at 480, 106 S.Ct. at 1298 (quotation omitted). A municipality is liable only if the tort was committed pursuant to a municipality's official policy. Id. at 479, 106 S.Ct. at 1298.
 
 
 100
 "The official policy requirement was intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." Id. at 479-80, 106 S.Ct. at 1298 (quotation omitted) (emphasis in original). The official policy requirement is the focal point for recent cases which have considered the issue. It has been precisely defined by the Supreme Court to maintain appropriate limits on burgeoning municipal liability. The district court, in its instructions to the jury, ran afoul of these appropriate limits. The majority opinion, in its attempt to save these flawed instructions, threatens to blur the precise distinctions required by Supreme Court authority.
 
 
 101
 The identification of officials whose decisions represent official policy is a question of state law to be determined by the trial judge before the case is submitted to the jury. Jett v. Dallas Independent School District, 491 U.S. 701, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (Jett ). "Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." Pembaur, 475 U.S. at 481, 106 S.Ct. at 1299 (plurality opinion); see also Jett, 109 S.Ct. at 2723.
 
 
 102
 Plaintiffs (collectively Davis) proceeded to trial against Mason County on a theory that the county had an official policy to hire, train, and supervise its deputy sheriffs inadequately. Davis argued that the county sheriff was the final policymaking authority for personnel. Consequently, he argued, the sheriff's personnel decisions constituted official county policy, on which Mason County liability could be pegged.
 
 
 103
 The district court adopted Davis's theory in its jury instructions. "The Sheriff of Mason County is the chief law enforcement officer of that county and a policy-making official for the Mason County Sheriff's Office." The majority has attempted to save this instruction by reference to Wash.Rev.Code Ann. Sec. 36.28.010 (West Supp.1990) ("The sheriff is the chief executive officer and conservator of the peace of the county."). Relying solely upon this statute, the majority holds that "[a]s chief executive officers, sheriffs possess final authority with respect to the training of their deputies, and thus it may be fairly said that their actions constitute county policy on the subject." Maj. op. at 1480.
 
 
 104
 The reality is decidedly more complex. The sheriff may be "chief executive officer and conservator of the peace" but he is profoundly not the final authority for personnel administration. Final authority for personnel administration does not rest with the county sheriff; rather it rests with the civil service commission (Commission), pursuant to Wash.Rev.Code Ann. Sec. 41.14 (West 1964 & Supp.1990). The Commission's extensive powers and duties include the making of rules and regulations about examinations, appointments, promotions, transfers, reinstatements, demotions, suspensions, and discharges, and which "may also provide for any other matters connected with the general subject of personnel administration." Wash.Rev.Code Ann. Sec. 41.14.060(1) (West Supp.1990).
 
 
 105
 "Implicit in the statutory scheme is the legislative intent to circumscribe the county sheriff's previously unbridled discretion in personnel matters." Fezzey v. Dodge, 33 Wash.App. 247, 249, 653 P.2d 1359, 1361 (1982). "A full reading of [Wash.Rev.Code Ann. Sec. ]41.14 reveals that in its enactment the legislature intended to preempt the coverage by county personnel systems of deputy sheriffs' selection, promotion and termination." Clallam County Deputy Sheriff's Guild v. Board of Clallam County Commissioners, 92 Wash.2d 844, 847, 601 P.2d 943, 946 (1979) (en banc).
 
 
 106
 The majority attempts to discount the policymaking authority of this broadly empowered Commission by isolating a portion of Davis's theory at trial and hanging the entire case on it. The majority argues that liability arises solely from a failure of training and not from any other aspect of personnel administration. Maj. op. at 1481. Of course, the majority is entitled to tailor its opinion as it sees fit, but it cannot alter state law or recent Supreme Court authority to match these developed contours.
 
 
 107
 It appears to me that the majority itself loses sight of its distinction. In a later section of its opinion, the majority simply asserts: "Since we have found failure-to-train liability as a matter of law, there is no need to inquire into whether the two other grounds upon which plaintiffs state their claim--negligent hiring practices and failure to provide adequate supervision--subjected the County to liability." Maj. op. at 1483 n. 5. In fact, the majority cannot so inquire, because to do so would undermine its theory of final policymaking authority, which depends on the absence of these other grounds. A few pages before, this distinction was crucial. Maj. op. at 1480. I have no explanation for this inconsistency.
 
 
 108
 Washington state law does not suggest a distinction between "hiring" and "training" for the purposes of final policymaking authority. In order to save Davis's case, the majority treats Washington law as if it said "the Commission may make rules and regulations about any matters connected with the general subject of personnel administration, except training." This, I respectfully suggest, it cannot do. Absent a state law basis for its distinction, and the majority does not propose one, both hiring and training are properly included within the "general subject of personnel administration," over which the Commission has final policymaking authority. Wash.Rev.Code Ann. Sec. 41.14.060(1) (West Supp.1990).
 
 
 109
 This is true, even if the sheriff actually hires or even trains his personnel, as recent Supreme Court authority makes clear. In Pembaur, two deputy sheriffs forcibly entered Pembaur's clinic to serve subpoenas on clinic employees. The deputies acted at the express direction of the county sheriff and an assistant prosecutor. The Supreme Court reversed the appellate affirmance of the district court's dismissal of Pembaur's section 1983 claim against the county. In doing so, the plurality was careful to distinguish the situation before us.
 
 
 110
 Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board.
 
 
 111
 475 U.S. at 483 n. 12, 106 S.Ct. at 1300 n. 12 (plurality opinion) (emphasis added). Thus, final authority with regard to law enforcement is irrelevant to a claim alleging a failure of personnel policy. The statement from Pembaur, as well as logic and common sense, makes this clear. Moreover, the actual exercise of discretion in hiring or training cannot change the locus of final policymaking authority, which is fixed by state law.
 
 
 112
 This last point is poignantly illustrated by another recent Supreme Court case, City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Praprotnik was transferred from one city agency to another and was then laid off. The jury found that the transfer and layoff had been retaliatory for Praprotnik's exercise of his first amendment rights. The jury exonerated the individual defendants and held the city liable.
 
 
 113
 The Supreme Court reversed the determination of municipal liability. The court of appeals in Praprotnik, like the majority here, held that Praprotnik's immediate supervisors had final authority with regard to his employment. Id. at 117, 108 S.Ct. at 920. Seven of the eight Justices considering the case disagreed with this contention. "To the contrary, the City Charter expressly states that the Civil Service Commission has the power and the duty [to consider and determine all personnel matters]." Id. at 129, 108 S.Ct. at 927 (O'Connor, J.) (plurality opinion) (bracketed material in place of statutory language); see also id. at 132, 108 S.Ct. at 928 (Brennan, J.) (plurality opinion).
 
 
 114
 Following Praprotnik, it matters not whether the sheriff actually hired or even trained his personnel. These acts are irrelevant to the locus of final policymaking authority. As I have already said, the issue turns solely on Washington law, which empowers the Commission with final policymaking authority over the entire subject of personnel administration. See Jett, 109 S.Ct. at 2723; Wash.Rev.Code Ann. Sec. 41.14.060(1) (West Supp.1990). Washington law does not distinguish between hiring and training, or between training and any other aspect of personnel administration, in its definition of Commission powers.
 
 
 115
 As directed by Praprotnik and Pembaur, and required by Washington state law, I would therefore hold that the Mason County sheriff is not a final decisionmaking authority with regard to "hiring" or "training" deputy personnel. This holding would require reversal as to Mason County, eliminating the need to consider the district court's second dispositive error. Since the majority both reaches and erroneously decides this issue, however, my discussion necessarily continues.
 
 II
 
 116
 The district court instructed the jury to find liability against Mason County if the county acted with "thoughtless disregard" or "reckless disregard." This is not the law. City of Canton v. Harris, 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (Canton ), holds that a municipality will be liable "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Id. 109 S.Ct. at 1204 (emphasis added).
 
 
 117
 Canton requires the jury to find an element of deliberateness; the district court's instructions did not. Thus, I would hold that the instructions and Canton are irreconcilable. The majority nevertheless attempts to save these erroneous instructions by overlooking the differences in language and by contending that, in any event, Mason County waived its objection.
 
 
 118
 The district court gave its instructions in apparent reliance upon Bergquist v. County of Cochise, 806 F.2d 1364 (9th Cir.1986), since Bergquist was the law of this circuit at the time those instructions were given. Bergquist held that municipal liability for a failure to train required no more than gross negligence. Id. at 1370. Subsequent to trial, however, the Supreme Court decided Canton, overruling Bergquist and requiring no less than a showing of deliberate indifference. See 109 S.Ct. at 1204 & n. 7.
 
 
 119
 The majority contends that by not anticipating Canton, and by not objecting to the Bergquist instruction at trial, the County waived the Canton objection--even though Canton was subsequently decided.
 
 
 120
 "No exception is required when it would not have produced any results in the trial court because 'a solid wall of Circuit authority' then foreclosed the point." Robinson v. Heilman, 563 F.2d 1304, 1307 (9th Cir.1977), quoting United States v. Scott, 425 F.2d 55, 57 (9th Cir.1970) (en banc). This rule protects the parties and district court from the burden of countless objections to previously decided points of law on the hope they may someday be changed.
 
 
 121
 The majority concedes as much. It argues, however, that Bergquist is not "a solid wall of Circuit authority." The majority states
 
 
 122
 [a]lthough in Bergquist we did hold that a policy of gross negligence in training could give rise to a claim for section 1983 liability, we said that "[t]he Supreme Court expressly reserved the question whether 'something less than intentional conduct, such as recklessness or "gross negligence," is enough to trigger the protections of the Due Process Clause.' " The Supreme Court subsequently answered this question in City of Canton. In Bergquist, by saying that the question was left open by the Supreme Court, we clearly indicated that the state of mind sufficient to find failure-to-train liability was not a settled point of law.
 
 
 123
 Maj. op. at 1481-82 (citations omitted). My reading of Bergquist is different. Bergquist observes the question left open by the Supreme Court and then proceeds to decide it. Its decision settled the point for this circuit and for the district courts within it, until overruled by Canton.
 
 
 124
 It is pointless to debate how "settled" the issue was within the circuit. At the time of trial, Bergquist was authority directly on point. The argument in this circuit was over. The district court instructions properly conformed to Bergquist--an objection would be useless. Thus, the Canton objection was not waived.
 
 
 125
 At best the majority's analysis shows that Bergquist was not a solid wall of Supreme Court authority. Indeed it was not. But Robinson does not require Supreme Court authority, nor should it. Robinson specifically refers only to a circuit wall. From the perspective of the district courts, for which the Robinson rule was announced, Ninth Circuit precedent is as controlling as that from the Supreme Court.
 
 
 126
 Should we adopt a rule waiving objections to adverse Supreme Court precedent while requiring those to mere Ninth Circuit precedent? This distinction makes no sense to me. The district court must follow both; an objection to either will be ineffectual at trial. Robinson announced a bright-line rule to minimize the delay and confusion of needless trial objections. The majority opinion obliterates it.
 
 
 127
 Perhaps the majority signals discomfort with its waiver theory by providing an alternative. Assuming the Canton objection was not waived, the majority contends that the erroneous instructions were harmless error. This is so, the majority argues, because the county's training policy was inadequate as a matter of law. Maj. op. at 1482. Surprisingly, this contention is unaccompanied by an articulation of the relevant standard of review. Indeed, it is difficult to discern the authority by which it can be made. The majority cites Canton, but Canton remanded the precise question the majority now keeps for itself. 109 S.Ct. at 1207.
 
 
 128
 As I have already discussed, Canton requires findings that (1) a county official with final decisionmaking authority (2) acted with deliberate indifference in adopting a policy that (3) caused the tort to occur. Id. at 1204-06. These elements impose an extraordinarily high burden on Davis, a burden rendered especially unamenable to appellate disposition by Canton 's emphasis on its innate fact-dependency. See id. at 1206.
 
 
 129
 The majority nevertheless states that the deputies "received no training in the constitutional limits of the use of force," maj. op. at 1482, and imposes county liability on this basis. Of course the deputies received training; the majority opinion itself recounts the training practices to discount their adequacy. Maj. op. at 1482-83. The majority's attempt to reconcile this contradiction highlights the difficulty with its premise. The majority asserts that while training did occur, it did not cover the "constitutional limits of the use of force." Maj. op. at 1482. This is an interesting way to define the issue, but one on which the record is utterly silent; my review of the record reveals absolutely no evidence at this level of detail, and the majority offers none. The absence of proof cannot be properly charged against the county, as the majority has done. Davis has the burden here. See Canton, 109 S.Ct. at 1206.
 
 
 130
 Ultimately, the entire inquiry misses the mark. Even if the absence of evidence could be properly held against the county, which of course it cannot, it would be irrelevant to the questions of authority and deliberation necessary for a finding of a Mason County policy, and to the question of causation.
 
 
 131
 [The] rule that a city is not liable under Sec. 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible. That much may be true. The issue in a case like this one, however, is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent "city policy."
 
 
 132
 . . . . .
 
 
 133
 Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury.
 
 
 134
 Id. at 1205-06. I have already discussed the elements of authority and deliberation, neither of which is present here. As for causation, the majority addresses this element only long enough to assert that it has been met. Maj. op. at 1483. By what authority does the majority justify this conclusion? No reliance can be placed on the jury's findings, for the jury considered causation in a much broader context. At trial Davis offered to link his injury to inadequate hiring, training, and supervision. Based on the instructions given, the jury might easily have found causation only as to supervision or only as to hiring. On appeal, however, the majority has stripped from this theory both hiring and supervision, leaving only training for which it imposes liability. Whatever else might be said, this much is absolutely clear: We have no jury finding in this case linking Davis's injury to "inadequate training in the constitutional limits of force." Therefore, at the very least, the majority should remand the case for a new trial on this question. As it now stands, the majority apparently finds this fact for itself. This, I suggest, it cannot do.
 
 III
 
 135
 The jury found the conduct of the deputy sheriffs completely unacceptable. It is thus tempting to fashion a theory imputing liability to Mason County, but the law requires we resist this temptation. The allure is to find some sure means of financial recompense for the torts that were committed, but that allure cannot be indulged here consistent with section 1983. The law imposes municipal liability only for torts caused by municipal policies, adopted by persons with final decisionmaking authority, after some element of deliberation. The law requires plaintiffs to prove each of these elements by a preponderance of the evidence.
 
 
 136
 The jury instructions at issue failed to follow the law. As a consequence, Davis was not required to meet his burden of proof, and the jury was unable to consider properly the claim of Mason County liability.
 
 
 137
 The majority attempts to save these erroneous instructions by contracting the scope of Washington's system of civil service and by contending that much of Mason County's case on appeal was waived during trial. The majority then completes its work by deciding the case against the county as a matter of law. For these reasons, I respectfully dissent from the holding affirming liability against the county.
 
 
 
 [1]
 Durbin's breathalyzer test, taken at the Mason County Jail, read .05, well below the legal definition of intoxication
 
 
 [2]
 Wash.Rev.Code Sec. 43.101.200 (1990)
 
 
 [3]
 Sowers received only three or four weeks in field training before he was sent out on patrol alone
 
 
 [4]
 Although Taylor did not sue the Mason County, this fact is still relevant to show the County's practice in training its officers
 
 
 [5]
 Since we have found failure-to-train liability as a matter of law, there is no need to inquire into whether the two other grounds upon which plaintiffs state their claim--negligent hiring practices and failure to provide adequate supervision--subjected the County to liability
 
 
 [6]
 Punitive damages were not awarded against Mason County. Under Sec. 1983, punitive damages may not be recovered from municipalities. City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981); E. Chemerinsky, Federal Jurisdiction Sec. 8.11, at 477 (1989) ("Punitive damages may be recovered from individual officers, although not from government entities.")
 
 
 [7]
 28 U.S.C. Sec. 1821(b) limits witness fees to $ 30.00 per day
 
 
 [8]
 28 U.S.C. Sec. 1920 reads:
 A judge or clerk of any court of the United States may tax as costs the following:
 (1) Fees of the clerk and marshal;
 (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case;
 (3) Fees and disbursements for printing and witnesses;
 (4) Fees for exemplification and copies of papers necessarily obtained for use in the case;
 (5) Docket fees under section 1923 of this title.