**COMING UP, INC. and Kim Corsaro, Plaintiffs,**

v.

**The CITY AND COUNTY OF SAN FRAN- CISCO, Richard Hongisto, Anthony Rib- era, Gary Delagnes, Jerry Golz, and Tom Yuen, Defendants.**

No. C–92–3714.

United States District Court, N.D. California.

Aug. 6, 1993.

William Bennett Turner, Rogers, Joseph, O'Donnell & Quinn, San Francisco, for plaintiffs.

Linda M. Ross, City Attorney's Office, San Francisco, for defendants City of San Francisco and Anthony Ribera.

Vincent J. Courtney, and Bruce T. Wilson, Davis, Reno & Courtney for defendants Gary Delagnes, Jerry Golz, & Tom Yuen.

Robert R. Moore, Moore, Divelbiss & Gulick, San Francisco, for defendant Richard Hongisto.

## ORDER

JENSEN, District Judge.

This civil rights action has now reached the stage where the Court must determine whether the City of San Francisco is a proper defendant in plaintiffs' 42 U.S.C. § 1983 cause of action. On June 16, 1993, the Court heard plaintiffs' and the City's cross-motions for summary judgment on the discrete issue of *Monell* liability. William Bennett Turner of Rogers, Joseph, O'Donnell & Quinn ap-

peared for plaintiffs. Linda M. Ross of the City Attorney's Office appeared for defendants City of San Francisco and Anthony Ribera. Vincent J. Courtney and Bruce T. Wilson of Davis, Reno & Courtney appeared for defendants Gary Delagnes, Jerry Golz, and Tom Yuen. Having considered the papers submitted, the arguments of counsel, the applicable law, and the entire record herein, the Court DENIES plaintiffs' motion and GRANTS defendant City's motion for the following reasons.

## I. BACKGROUND

### A. Factual History

This well-known civil rights lawsuit stems from the seizure of between 2,000 and 4,000 copies of the *Bay Times*, a free, biweekly newspaper distributed primarily within San Francisco. The *Bay Times* reports on topical issues and is directed toward the citizens of San Francisco, particularly the gay, lesbian, and bisexual communities.

On May 7, 1992, the *Bay Times* published and distributed a critical account of how San Francisco police and then Police Chief Richard Hongisto handled the demonstrations that followed the verdict in the first Rodney King beating case. The May 7th *Bay Times* front page contained a picture of Hongisto's face superimposed on the body of someone dressed in a police uniform. The person depicted was holding a police baton, or nightstick, between his legs. The image plainly intended to deride and lampoon the police chief, conjuring up an image of Hongisto clutching an erect penis with both hands. The caption on the cover read, "Dick's Cool New Tool: Martial Law."

Plaintiffs allege that Hongisto, apparently upset by the offensive publication, attempted to prevent circulation of the May 7th edition by ordering the papers removed from their distribution stands. Specifically, plaintiffs assert that Hongisto directed Sergeant Gary Delagnes to remove the papers who, in turn, instructed police inspector Jerry Golz and officer Tom Yuen to confiscate copies of the *Bay Times*. Plaintiffs further allege that

Hongisto, Delagnes, Golz, and Yuen conspired to seize and remove the newspapers from the racks.

Plaintiffs contend that Hongisto's plan was executed during the early morning hours of May 8, 1992, when Delagnes, Golz, and Yuen, while on duty, driving an undercover police vehicle, seized the newspapers from the Mission, Castro, and Upper Market districts of San Francisco. Plaintiffs aver that between 2,000 and 4,000 copies of the newspaper were seized and that about 2,000 of the seized newspapers were eventually returned to plaintiffs by members of the San Francisco Police Department.

On May 15, 1992, after an investigation and a special meeting, the San Francisco Police Commission ("Commission") unanimously decided to discharge Hongisto for his involvement with the seizure of the *Bay Times* newspapers. On the same date, District Attorney Arlo Smith of the City and County of San Francisco announced that no criminal charges would be filed against Hongisto, reportedly explaining that the seizing of these newspapers does not violate state theft laws because the papers were given away for free.

### B. Procedural History

On September 9, 1992, plaintiffs Coming Up, Inc., the corporation that publishes the *Bay Times*, and Kim Corsaro, editor and publisher of the *Bay Times*, commenced this lawsuit. The defendants in this action are the City and County of San Francisco ("City"); Richard Hongisto, then Police Chief of the San Francisco Police Department ("SFPD" or "Department"); Anthony Ribera, the current Chief of Police, who is sued only in his official capacity;[1] Gary Delagnes, a sergeant for the SFPD; Jerry Golz, an inspector for the SFPD; and Tom Yuen, a police officer for the SFPD.

Plaintiffs plead four causes of action: (1) violation of 42 U.S.C. § 1983; (2) violation of California Civil Code § 52.1; (3) violation of the California Constitution; and (4) declaratory relief. Plaintiffs' first cause of action

---

1. Then acting Chief of Police Thomas F. Murphy was named in plaintiffs' original complaint.

Plaintiffs filed their first amended complaint on December 16, 1992.

seeks injunctive relief and compensatory damages against all defendants, and punitive damages against Hongisto, Delagnes, Golz, and Yuen. Plaintiffs' second and third claims seek injunctive relief and damages. The fourth claim seeks declaratory relief.

The City has asserted cross-claims against defendants Hongisto, Delagnes, Golz, and Yuen. Hongisto, in turn, has asserted his own cross-claims against all defendants. Similarly, defendants Delagnes, Golz, and Yuen have advanced cross-claims against both the City and Hongisto.

On December 7, 1992, the Court denied the City's motion to dismiss the section 1983 cause of action. The Court concluded that because both the City and plaintiffs relied on the San Francisco Charter to support their positions, dismissing the action would be improper. As the determination of the City's so-called *Monell* liability turned on evidence outside the four corners of plaintiffs' pleading, the Court noted that a summary judgment motion would be the proper testing ground for considering the issue.

Accordingly, on April 14, 1993, defendant City moved for summary judgment on plaintiffs' section 1983 cause of action. Plaintiffs have cross-moved on the same issue. Defendants Delagnes, Golz, and Yuen oppose the City's motion, and have submitted papers to support their position. The center of the storm, defendant Hongisto, has remained silent on the matter. After several stipulations postponing the hearing, the parties settled on the June 16, 1993 hearing date. The Court now resolves the cross-motions, which address only the question of whether or not the City can be held liable under the principle enunciated by the U.S. Supreme Court in *Monell v. Department of Social Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(c) of the Federal Rules of Civil Procedure, a district court may grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Recognizing that summary judgment motions can contribute significantly to the resolution of litigation when there are no factual issues, the Supreme Court and the Ninth Circuit have established the following standards for consideration of such motions: "If the party moving for summary judgment meets its initial burden of identifying for the court those portions of the materials on file that it believes demonstrates the absence of any genuine issues of material fact," the burden of production then shifts so that "the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, *'specific facts* showing that there is a genuine issue for trial.' " *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987) (quoting Fed.R.Civ.P. 56(e) (emphasis added) and citing *Kaiser Cement Corp. v. Fischbach & Moore, Inc.,* 793 F.2d 1100, 1103–04 (9th Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 435, 93 L.Ed.2d 384 (1986) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). With respect to these specific facts offered by the non-moving party, the court does not make credibility determinations or weigh conflicting evidence, and is required to draw all inferences in a light most favorable to the non-moving party. *T.W. Elec. Serv.,* 809 F.2d at 630–31 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Rule 56(c) nevertheless requires this Court to enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552. The mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient: "[T]here must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). This Court

thus applies to either a defendant's or plaintiff's motion for summary judgment the same standard as for a motion for directed verdict: "[W]hether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*

## III. DISCUSSION

The Court's sole task is to determine whether or not the City may be held liable under 42 U.S.C. § 1983 for plaintiffs' damages. Both the City and plaintiffs agree that the Court, and not a jury, must resolve this issue. *See* City's Moving Brief, Apr. 14, 1993, at 14; Plaintiffs' Opposition and Cross–Motion Brief, May 10, 1993, at 4; *see also Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 736, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989).

### A. *Legal Standard for 42 U.S.C. § 1983*

■ To support a claim under 42 U.S.C. § 1983, plaintiffs must demonstrate two elements: (1) the violation of a right secured by the Constitution and laws of the United States; and (2) that the alleged violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 46–48, 108 S.Ct. 2250, 2254–55, 101 L.Ed.2d 40 (1988).

In this case, plaintiffs allege violation of their First, Fourteenth, and Fourth Amendment rights by Hongisto's direction to, or conspiracy with, Delagnes, Golz, and Yuen to seize newspapers in retaliation for plaintiffs' exercise of protected speech.

### B. *The Concept of Monell Liability*

#### 1. *Legal Standard*

■ A municipality, such as the City, may not be found liable under section 1983 in respondeat superior for the acts of its employees. *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036.[2]

However, the U.S. Supreme Court in *Monell* overruled its decision in *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), which had immunized municipalities from suit under section 1983, by holding that municipal governments may be sued for section 1983 violations which were caused by their own unconstitutional or illegal policies. The Court's analysis of the legislative history of the "Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Monell*, 436 U.S. at 689, 98 S.Ct. at 2035 (emphasis in original).

■ Municipalities can be sued directly for section 1983 violations caused by a "policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers." *Id.* at 690, 98 S.Ct. at 2036. In addition to "official policy," local governments may be sued for deprivations "pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision-making channels." *Id.* The custom, although not authorized by written law, must be "so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 166, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970)).

■ The concise rule, in sum, is that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury [then] that the government as an entity is responsible under § 1983." *Id.* at 692–95, 98 S.Ct. at 2037–38.

■ The existence of an official municipal policy or custom may be established in several ways. First, actions by the municipal legislative body, even single acts, constitute official policies. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 106 S.Ct. 1292, 1298,

---

**2.** Plaintiffs sue defendant Ribera only in his official capacity as Chief of the SFPD. As stated in the December 7, 1992 Order, a suit against an official in his or her official capacity is not a suit against the official but rather a suit against the official's office. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70, 109 S.Ct. 2304, 2311, 105 L.Ed.2d 45 (1989). As such, it is no different from a suit against the governmental entity itself. *See id.* Accordingly, the suit against Ribera states a claim against the City only.

89 L.Ed.2d 452 (1986) ("No one has ever doubted . . . that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy").

■ Second, official policy exists when agencies or boards exercise authority which has been delegated to them by the municipal legislative body. *See Monell,* 436 U.S. at 692–95, 98 S.Ct. at 2037–38.

■ Third, the ratification of a subordinate's unconstitutional action by an official with policymaking authority can invite liability. *See City of St. Louis v. Praprotnik,* 485 U.S. 112, 127–28, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988) (plurality opinion); *Gillette v. Delmore,* 979 F.2d 1342, 1346–47 (9th Cir.1992).

■ Finally, a plaintiff may show that an official who committed the violation was an official with final policymaking authority and that the action itself thus constituted an act of official governmental policy. *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299 ("[m]unicipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered"); [3] *Gillette,* 979 F.2d at 1346.

The *Pembaur* decision expands upon the basic framework of *Monell* liability. Not only can a formal policy or a permanent custom invite liability, but *Pembaur* also permits municipal liability for a decision to take a particular course of action if that decision is properly made by the government's authorized decisionmakers, stating that "it surely represents an act of official government 'policy' as that term is commonly understood." *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299.

■ The municipality is liable for an official's unconstitutional action only when the official has "final authority to establish . . . policy with respect to the action ordered." *Id.* Mere authority to exercise discretion while performing particular functions, however, does not make the individual a final policymaker unless the decisions are final and unreviewable and are not constrained by the official policies of superior officials. *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926; *Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir.1993), *petition for cert. filed* (June 9, 1993). A final policymaker can derive the authority to make final policy from customs or formal enactments or delegation from those with final policymaking authority. *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300; *Feliciano,* 988 F.2d at 655.

■ The determination of whether a particular official has final policymaking authority is a question of state law. *Jett,* 491 U.S. at 737, 109 S.Ct. at 2723; *Praprotnik,* 485 U.S. at 123, 108 S.Ct. at 924; *Gillette,* 979 F.2d at 1346. A trial judge must examine statutes, ordinances, regulations, city charters, and other similar enactments to determine whether an official has final policymaking authority. *Wulf v. City of Wichita,* 883 F.2d 842, 868 (10th Cir.1989). By reviewing these materials, as well as considering any evidence of the existence of a custom or usage which has the force of law, a trial judge can identify those officials "who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett,* 491 U.S. at 737, 109 S.Ct. at 2723.

### 2. *Plaintiffs' Theory*

Plaintiffs rely only upon the final theory of *Monell* liability discussed above. *See* Plaintiffs' Opposition and Cross–Motion, May 10, 1993, at 2–3 n. 1. That is, plaintiffs allege that Hongisto himself was "responsible for establishing and enforcing official government policy for the San Francisco Police

---

**3.** As a result, depending on the circumstances, different City officials or agencies can be the final City policymaker on police matters. "[P]articular officers may have authority to establish binding . . . policy respecting particular matters and to adjust that policy . . . in changing circum-

stances." *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300. Thus, "there will be cases in which policymaking responsibility is shared among more than one official or body." *Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 925.

Department," First Amended Complaint, at ¶ 7; that Hongisto "made a policy decision as Chief of Police to have police officers remove the newspapers from the news racks and other distribution points," *id.* ¶ 16; and that, as a result, the City is liable under section 1983 for the action of its authorized decision-maker. Plaintiffs do not contend that this "policy decision" can be attributed to any action by City legislators or agencies, or by any custom or usage. In essence, plaintiffs insist that the Chief of Police is the relevant policymaker for the policy at issue in this case and that, although no such policy existed before his action and no such policy exists now, the City is liable for its unconstitutional policy said to exist at the moment the papers were seized.

The City, naturally, rejects plaintiffs' theory, arguing that Hongisto did not have final authority to decide policy, but rather that the San Francisco Police Commission is the final policymaker. The Court is thus obligated to delve into the law that defines police policy-making in San Francisco.

## C. *Policymaking Authority for the San Francisco Police*

Inquiry by the Court into the power structure surrounding the San Francisco Police Department requires an examination of not only the City Charter, but other relevant sources of positive law. Moreover, to the extent that ambiguity may exist, less formal sources of law such as the City's custom and practice must also be considered.

### 1. *The San Francisco City Charter*

 Section 3.530 of the San Francisco City Charter ("Charter") provides that the Commission, which consists of five members appointed by the mayor, "shall have the power and duty to organize, reorganize and manage the police department." Charter § 3.530. It has the power to "prescribe reasonable rules and regulations." *Id.* § 3.500(a). The Commission "shall appoint a chief of police who shall hold office at its pleasure." *Id.* § 3.532. Further, each "appointive department head shall be *immediately responsible* to the [appointing commission] for the administration of his depart-

ment, and shall file an annual report and make such other reports, estimates and recommendations at the time and in the manner required by law, or as required by the [appointing commission]." *Id.* § 3.501 (emphasis added).

The Commission also has the authority to approve General Orders before they are issued, and does so only after a noticed and public hearing. General Orders are written directives that set forth Department policies and procedures. *See* Low Declaration, Apr. 14, 1993, at 2; Barretta Declaration, Apr. 14, 1993, at 2. The Commission has approved over one hundred General Orders. Barretta Declaration, at 3, Ex. B. There are General Orders concerning the handling of seized property, the observation of First Amendment rights, and the tolerance of free speech. *See id.* at 3–4, Exs. C, D, F, G, I, and J. There is even a General Order which instructs all members of the Department to follow General Orders. *Id.* Ex. M (General Order D–1).

Moreover, the Commission has the authority to annul actions taken by the Chief of Police. Nothing demonstrates this authority more than this case where the Commission terminated Hongisto because "he had violated Department rules and policies, including those set forth in General Rule D–1." Low Declaration, at 4. In particular, the Commission stated that "the Chief exercised poor judgment and abused his power in this incident." *Id.* at 3.

The Charter plainly indicates that the Commission is a policymaker, but this does not necessarily mean that it is the only policymaker for the Police Department and this does not necessarily mean that it was the policymaker with respect to the policy at issue. Indeed, plaintiffs proffer that the Police Chief also has policymaking authority which is delineated in the Charter. For example, the Chief "may from time to time, disburse [sums appropriated to the police by the Board of Supervisors] as in his judgment shall be for the best interests of the city and county in the investigation and detection of crime." Charter § 3.539. The Chief may also make determinations when the "public interest or necessity" requires officers to

work extra hours or be deployed during vacation. *Id.* § 8.451. In addition, the Chief, pursuant to General Order P–1, has authority to transfer Department members from one assignment to another and final authority for all transfers rests with the Chief. Under General Order A–5, the Chief has authority to direct personnel within the Department and make specific assignments. *See* Trigueiro Declaration, May 13, 1993, Ex. F.[4]

These provisions indicate that the Chief possesses some authority, and certainly retains wide discretion to perform his duties. However, the Charter itself does not clearly and unequivocally reveal whether the Chief has actual policy powers or merely plays a ministerial role in enforcing the law and carrying out policy set by the Commission. Moreover, even if the Chief is a policymaker, the Charter does not lend any specific support to the notion that he is a final policymaker for the policy at issue. More sources must be examined before resolving the issue of *Monell* liability.

### 2. *California Statutory Law*

California Government Code section 38630 provides that the "police department of a city is under the control of the chief of police." Cal.Gov't Code § 38630. Plaintiffs thus conclude that state law vests policymaking authority with the Chief of Police.

However, section 38630 does not apply to charter cities, such as San Francisco. *See Brown v. City of Berkeley*, 57 Cal.App.3d 223, 236, 129 Cal.Rptr. 1 (1976). Under the California Constitution, "chartered cities are specifically provided the authority to constitute, regulate and govern city police departments." *Id.* Indeed, it "is well established that the charter of a municipality is its constitution." *City & County of San Francisco v. Patterson*, 202 Cal.App.3d 95, 102, 248 Cal.Rptr. 290 (1988).

Plaintiffs argue that *Brown* is outdated. Yet this case has been neither rejected nor

"gutted." *Brown* is still good law. Accordingly, the Court will not consider this statute in evaluating the Chief's policymaking authority.

### 3. *San Francisco Police Code*

The City's Board of Supervisors enacted the San Francisco Police Code. The Police Code contains the following provision which speaks of newsracks:

> No person shall ... keep or maintain any newspaper or news periodical in any newsrack located on any public sidewalk or street in such a manner as to expose to the public view any photograph, cartoon or drawing, contained within such publication, displaying any of the following: (1) The genitals, pubic hair, buttocks, natal cleft, perineum, anal region or pubic hair region of any person other than a child under the age of puberty; (2) Any portion of the breast, at or below the areola thereof, of any female person, other than a child under the age of puberty.

Police Code, Art. 10.1, § 716.

Section 717 of the Police Code empowers the "Chief of Police or any officer or employee designated by him" to remove any newsrack used in violation of the Article. *Id.* § 717.

As a result, plaintiffs argue that Hongisto's confiscation of newspapers, papers which depicted him in a mock act of masturbation, relates to the Police Code and that this relation crowns the Chief the final policymaker on newsracks or activities related to newsracks.

Although the argument that the *Bay Times* front page violated Police Code § 716 and that Hongisto was legitimately enforcing this section can only be characterized as fanciful, the Police Code does give the Chief of Police, and not the Commission, the power to take actions regarding newsracks. However, the power to act does not equal the power to make policy. The provision is bet-

---

4. However, General Order A–5 acknowledges that the SFPD is under the management of the Commission and that, although the Chief of Police is considered the Chief Executive of the Department, the Commission "shall organize and reorganize the Department, *set policy*, adopt rules and regulations, approve the annual Department budget, and perform other functions as required by law." *Id.* (emphasis added).

ter read as simply instructing the Chief on his duties. Action pursuant to the provision would demonstrate only that the Chief was executing his duties, and not creating or making policy. The Police Code simply gives the Chief power to enforce the ordinance, not fashion the policy implicit in the provisions of the ordinance. Moreover, the Chief lacks the policy power to amend the ordinance in any way or to establish a contrary ordinance expressing a different policy.

#### 4. *Custom and Practice*

" '[C]ustom or usage' having the force of law" may be reviewed in addition to positive law in order to help determine who is a final policymaker. *See Jett,* 491 U.S. at 737, 109 S.Ct. at 2723; *Pembaur,* 475 U.S. at 485, 106 S.Ct. at 1301; *Feliciano,* 988 F.2d at 655; *Mandel v. Doe,* 888 F.2d 783, 793 (11th Cir. 1989) ("the court should examine ... relevant customs and practices having the force of law"). "Before a custom can be the basis for a civil rights violation, the custom must be 'so permanent and well settled as to constitute a "custom or usage" with the force of law.' " *Feliciano,* 988 F.2d at 655 (quoting *Monell,* 436 U.S. at 691, 98 S.Ct. at 2036).

Plaintiffs point to the fact that Hongisto himself admitted and testified that he was responsible for establishing and enforcing official government policy for the San Francisco Police Department. However, despite Hongisto's extended career in law enforcement, albeit with brief tenure as Police Chief in San Francisco, such an admission is plainly self-serving and binds neither the City nor this Court. Hongisto complains that the City failed to defend him in this lawsuit and has filed a cross-claim against the City. In short, although Hongisto's admission and testimony may reflect his personal opinion, it is no more than that. Given his personal litigation interest and, more particularly, the overall state of the evidence on this record, his opinion does not establish a "permanent and

well settled custom" carrying with it the force of law.

Hongisto's actions, however, are arguably more persuasive. Hongisto testified that he initiated a "prostitute abatement program" and a "crime suppression task force" without any discussion with the Commission. Turner Declaration, May 10, 1993, Ex. I, at 21–22, 24–25. The City does not dispute this testimony. As Hongisto states, "the management of the police department is in the purview of the police chief." *Id.* at 148.

Thus, plaintiffs argue that the Chief has general authority, both inherently and by custom and practice, to make policy decisions for the Department, or, at the least, the Chief shares final policymaking authority with the Commission.[5] As a result, the Chief may in fact be a policymaker for certain conduct based upon custom and practice, assuming that Hongisto's actions reflected a permanent and well settled custom having the force of law. The key inquiry for the Court, however, is whether the Chief is the final policymaker for the policy at issue.

#### D. *Analysis—Is the Chief the Final Policymaker for the Policy at Issue?*

#### 1. *The Policy at Issue*

The Chief of Police need not have final authority over all areas of Department policy in order to make final policy over a discrete area. The Commission may have final authority over certain areas and the Chief others. *See Davis v. Mason County,* 927 F.2d 1473, 1480 (9th Cir.1991) ("a particular officer may have authority to establish binding policy with respect to particular matters, but not others"). "To establish municipal liability under section 1983, it must be shown that the decisionmaker possesses final authority to establish municipal policy *with respect to the action ordered.*" *Id.* (citing *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299) (emphasis

---

**5.** Plaintiffs also note that the Chief earns $124,-210 per year while each commissioner is paid only $100 per month. This salary gap, however, hardly can be considered a relevant custom which reveals where policymaking authority resides. The final policymaking authority does not necessarily go hand-in-hand with the highest sal-

ary. Moreover, plaintiffs' observation that the job description for the Chief of Police states that the "Chief manages a Department with 1800 sworn and 400 non-sworn employees" is unhelpful. Even if the job description itself was afforded binding legal authority, the term "manages" is not the equivalent of "makes final policy."

added). It is thus necessary to determine what the policy at issue is in this case.

■ An unconstitutional policy can be "inferred from a single decision taken by officials whose acts represent official policy, even though the decision is not intended to govern future situations." *Hammond v. County of Madera*, 859 F.2d 797, 801 (9th Cir.1988) (citing *Pembaur*, 475 U.S. 469, 106 S.Ct. 1292); *see also Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.1991) ("official liability may also be imposed where a first-time decision to adopt a particular course of action is directed by a governmentally authorized decisionmaker"); *Los Angeles Police Protective League v. Gates*, 907 F.2d 879, 889 (9th Cir.1990) ("a single action by the final decisionmaker may be sufficient to establish that a municipality has a policy that infringes on a person's constitutional rights").

At the hearing, plaintiffs argued that the policy or conduct at issue in this case is the Chief's authority to deploy troops. This power, rooted in General Order A–5,[6] according to the plaintiffs' proffer, enabled the Chief to deploy officers in such a way as to seize newspapers. While interesting, plaintiffs' theory is too broad and unworkable. Deploying troops is hardly synonymous with a policy. By its nature, to be actionable, the municipal policy which causes the harm must run afoul of the laws or Constitution of the United States. In other words, the touchstone of the section 1983 action against a municipality is the "allegation that official policy is responsible for a deprivation of rights." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. The policy at issue must cause the deprivation of rights. The authority to order police officers to take action does not in itself violate any law, it is only when the conduct ordered is in violation of the laws or Constitution of the United States that it can be said to be an actionable violation of section 1983.

By turning to the facts in this case, the Court concludes that the policy or conduct at issue is the seizure of newspapers based upon their content. A brief sampling of relevant case law supports this conclusion.

In *Pembaur*, deputy sheriffs, following instructions from the assistant prosecutor, who in turn received orders from the county prosecutor, chopped down plaintiff's door with an axe to obtain witnesses allegedly hiding behind the locked door. *Pembaur*, 475 U.S. at 471–73, 106 S.Ct. at 1294–95. Plaintiff filed a section 1983 action against, among other parties, the city of Cincinnati and the assistant prosecutor. The Supreme Court discussed the specific policy of carrying out a search by a forcible entry without a warrant as the relevant violation of the Fourth Amendment, not the general policy of providing instructions to sheriffs. *See id.* at 479–85, 106 S.Ct. at 1298–1301.

In *Monell*, the Court considered the specific policy of requiring pregnant employees to take unpaid leaves of absence before such leaves were medically necessary, rather than the general policy of the defendant's power to make citywide health policy. *See Monell*, 436 U.S. at 661, 98 S.Ct. at 2020.

In *Feliciano*, the court turned to the specific policy of surprise drug testing without standards or procedures for police cadets, not the general policy of supervising cadets. *See Feliciano*, 988 F.2d at 653.

More to the point, the Supreme Court in *Praprotnik* made clear that a city "cannot be held liable under § 1983 unless [plaintiff] prove[s] the existence of an *unconstitutional* municipal policy." *Praprotnik*, 485 U.S. at 128, 108 S.Ct. at 926 (emphasis added). Plaintiffs' bold assertion, without case authority, that deploying officers is policy enough misses the mark. Plaintiffs must establish the existence of an unconstitutional policy which causes the harm. The ability to deploy troops is not in itself unconstitutional. However, ordering the troops to seize newspapers based upon their content may well be unconstitutional.

In short, *Monell* and its progeny direct the Court to look for an unconstitutional policy. Plaintiffs' theory is too broad, it casts too large a net in its attempt to capture liability, and at bottom, imposes respondeat superior liability on the municipality. Accordingly, the Court finds that the municipal policy

---

6. *See* Triguciro Declaration, May 13, 1993, at 4, ¶ 7, and Ex. F.

actually at issue in this case is the taking of newspapers based upon their content.

### 2. Policymaker for the Policy at Issue

The next step of the analysis is to determine whether the Chief was the policymaker with respect to the policy at issue.

As described above, there may be more than one City policymaker. *See, e.g., Praprotnik,* 485 U.S. at 125, 108 S.Ct. at 925 ("there will be cases in which policymaking responsibility is shared among more than one official or body"). What is determinative, however, is who has the policymaking authority for the policy or conduct at issue. *Jett,* 491 U.S. at 737, 109 S.Ct. at 2723 ("the trial judge must identify those officials . . . who speak with final policymaking authority . . . concerning . . . the particular constitutional or statutory violation at issue").

The City may be liable under section 1983 when the City's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Hammond,* 859 F.2d at 802 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38). The question now is whether the Chief is the policymaker for the conduct at issue. That is, whether the Chief's actions in ordering the removal of newspapers based on their content may fairly be said to define official policy. The Chief must have the "final authority to establish municipal policy with respect to the [challenged] action." *Pembaur,* 475 U.S. at 481, 106 S.Ct. at 1299.

"Consistent with the commonly understood meaning of custom, proof of random acts or isolated events are insufficient to establish custom. Only if a plaintiff shows that his injury resulted from a 'permanent and well-settled' practice may liability attach for injury resulting from custom." *Thompson v. City of Los Angeles,* 885 F.2d 1439, 1443–44 (9th Cir.1989); *see also Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926.

The record in this case establishes that the Commission was the entity authorized to make policy in the area of First Amendment rights, and has also established policies concerning the handling of seized property. *See* Barretta Declaration, Apr. 14, 1993, Exs. C, D, F, G, I, and J (General Orders). The taking of newspapers based upon content falls into the Commission's domain. The Charter speaks to the Commission's policy authority as well. Plaintiffs' reliance on the Police Code is imprudent because, as discussed above, the Code merely allots the Chief the power to enforce ordinances, rather than award him the power to create policy. Plaintiffs offer no other relevant source of written law or policy that relates to the conduct at issue.[7]

Moreover, the Court finds no evidence in the record to support the assertion that the City had a *custom* of seizing newspapers based upon content. Some evidence presented indicates that the Chief does have power to create programs and take steps to abate crime. *See, e.g.,* Turner Declaration, May 10, 1993, Ex. I, at 21–22, 24–25. However, when turning to the conduct at issue, the confiscation of these newspapers was a random and unique event which did not stem from a settled and permanent custom. Nor does the Chief of Police, either prior to or after the instant incident, have any policy or custom of confiscating newspapers, an activity bearing no relation to crimefighting. There is no evidence of a custom and practice of the

---

**7.** Plaintiffs nevertheless maintain that "single act" cases control. This argument is misguided. The single act, for example, of chopping down a door, as in *Pembaur,* relates to the unconstitutional policy of entering without a warrant. There was no custom of entering without a warrant in *Pembaur,* however, there was a written Ohio statute that enabled the county prosecutor to give instructions to county sheriffs. The statute in itself was not unconstitutional, but it did delegate policy power to the prosecutor. The prosecutor made a final, unreviewable decision in *Pembaur* which placed him as the final policy-

maker for the county. *Pembaur,* 475 U.S. at 485, 106 S.Ct. at 1301 (the Court accepted, with great deference, the appellate court's conclusion, based on an interpretation of Ohio law, that the prosecutor could establish county policy).

Here, there is no such written law or policy that awards the Chief the power to make such a decision that would render the City liable for a single act. For "single act" cases, the evidence must demonstrate that the municipality has decided to entrust all policy decisions, or at least the one at issue, with the one person who is not subject to review. This is not the case here.

San Francisco Police Department which bolsters plaintiffs' argument. Instead, their position hinges upon speculation and guesswork about what they contend is the "real" power scheme is on the street. However, even if plaintiffs have guessed correctly, the Court is not to rely heavily on the de facto power structure. *See Praprotnik,* 485 U.S. at 123 n. 1, 108 S.Ct. at 924 n. 1; *see also Auriemma v. Rice,* 957 F.2d 397, 400 (7th Cir.1992); *Wulf,* 883 F.2d at 869 (courts are not to look to where de facto authority may reside).

In the final analysis, San Francisco is a charter city—the City Charter governs and the Chief, vis-a-vis the Commission, is a ministerial officer. Although the Chief's powers may be significant and strong, and although he may be able to create and maintain certain crime prevention programs, he is nevertheless subservient to the Commission. This is particularly evident when considering the policy decision at issue in this case. Just because the Chief has certain power, it does not follow that he is a policymaker. The Chief has discretion in the exercise of particular functions and manages daily police operations within the framework set by the Commission. The Chief can recommend policy, follow policy, execute policy, but he cannot establish policy with respect to the policy at issue in this case.[8] Neither written edicts nor custom and usage supports a contrary conclusion.

### 3. *Final Policymaker for Policy at Issue*

Not only must the Court determine who has policymaking authority for the City, but the Court must also "ensure that the municipal official possesses the authority and responsibility for establishing final policy with respect to the issue in question." *Mandel,* 888 F.2d at 793 (citing *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926) (emphasis in original); *see also Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300. "Mere authority to exercise discretion while performing particular functions does not make a municipal employee a final policymaker unless the official's decisions are *final and unreviewable* and are not constrained by the official policies of superior officials." *Feliciano,* 988 F.2d at 655 (citing *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926) (emphasis added); *see also Gillette,* 979 F.2d at 1348.

Even if the Chief has some policymaking role for the policy at issue, the evidence demonstrates that the Commission is the final authority on policy. The Chief's decisions are reviewable. The City Charter provides that the Chief serves at the Commission's pleasure and is immediately responsible to the Commission. This power was exercised when the Commission terminated the Chief, after an investigation, for his role in confiscating the newspapers. The fact that the Commission had the ability and most emphatically did discharge the Chief for his conduct in this matter reveals that the Chief is not the final policymaker.[9] Moreover, the fact that the Chief was actually fired for seizing the newspapers demonstrates that the Commission's final authority is not illusory. *Cf. Flanagan v. Munger,* 890 F.2d 1557, 1569 (10th Cir.1989) (city's admission "that there is no provision for ... review" demon-

---

**8.** Plaintiffs also make much of the fact that General Order P–1 gives the Chief "authority for the transfer of personnel." However, employee transfers are not at issue here, and even if they were, this General Order does not give the Chief authority to make "policy" about transfers. The Chief's ability to make specific assignments does not translate into policy ability. If it did, all mid-level officers, such as captains, who are given responsibility, under General Order A–5, for the "control, management, and direction of members assigned to their command," would become policymakers. This is the deployment argument restated and once again it leads squarely to respondeat superior.

**9.** Even if plaintiffs' argument on policy carried the day, *i.e.,* deploying troops was the policy at issue, plaintiffs would still not triumph because, in any event, the Chief was not, nor could he be, the *final* policymaker.

In other words, even if *Pembaur* could be read so broadly as to suggest that the policy in that case was the prosecutor's authority to give county sheriffs instructions, found in the Ohio Code, and even if *Pembaur* could be read so broadly as to suggest that any act taken under such a broad policy subjected municipalities to liability, plaintiffs' position would still fail. Although, under this expansive interpretation of *Pembaur,* any act taken under the guise of deploying troops would make the Chief a policymaker, he would not be the final policymaker because his actions are in all cases subject to review.

strated that, "for all intents and purposes the Chief's [decision was] final, and any meaningful ... review [was] illusory").

Plaintiffs argue that because the Commission has failed to pass a General Order specifically prohibiting the removal of newspapers, the current Chief of Police can institute a policy of newspaper seizure. This argument, however, defies common sense.[10] The Commission, through its termination of Hongisto, made it unmistakably clear that such unauthorized behavior was an abuse of power which is not the policy of the City of San Francisco and warrants dismissal. One would have to ignore reality to seriously believe that another police chief would embark on such self-destructive and plainly intolerable behavior. The Commission's action made quite obvious that the product of such conduct is discharge. Certainly, then, it cannot be concluded that the Chief is the final policymaker with respect to the policy at issue.

Although plaintiffs do not advocate a theory of delegation, this view, too, would fail. No policy power was delegated to the Chief from the Commission. The Commission never yielded its power to make policy respecting First Amendment rights and never consented to the Chief's newspaper heist. Nor could it be argued that the Commission ratified the Chief's conduct. Rather than endorse the Chief's action, the Commission, as the final policymaker, in effect nullified Hongisto's action by terminating him for his role in taking the newspapers. Finally, by definition, if the Chief was the final policymaker on seizing newspapers based on their content, his action would have set policy and have been unreviewable. The Commission could not have fired the Chief if he set a final policy, and the Chief, by virtue of establishing the policy, would not have violated his own policy. The Commission was able to discharge the Chief precisely because the Chief did not have final authority to establish policy and his conduct was impermissible.

Accordingly, the Court concludes that the Chief of Police is not the final policymaker with respect to the policy at issue here and that the City's motion, therefore, must be granted.

### E. Plaintiffs' Plea for a Continuance

Plaintiffs, in their reply, argue that even if the Court is prepared to rule in favor of the City it cannot do so. The reason, they proffer, is because plaintiffs lodged a motion on June 9, 1993 to reconsider Magistrate Hamilton's discovery order of June 7, 1993, thus creating an outstanding discovery matter pending before the Court.

Local Rule 410–2 provides, in part, that the reviewing judge:

> may deny the motion by written order at any time, but shall not grant the motion without the opposition having had an opportunity to brief the matter. If no order denying the motion or setting a briefing schedule is made within thirty days of filing the motion, the motion shall be *deemed denied.*

Local Rule 410–2(a) (emphasis added).

Plaintiffs' discovery motion is not an obstacle. The Court, having considered plaintiffs' papers, finds that Magistrate Hamilton correctly ruled on the discovery motion. In any event, the thirty-day period has lapsed and the motion is thus deemed denied.

### IV. CONCLUSION

For the foregoing reasons, the Court ORDERS as follows:

1. Defendant City's motion for summary judgment on plaintiffs' 42 U.S.C. § 1983 cause of action is GRANTED.

2. Plaintiffs' motion for summary judgment is correspondingly DENIED.

---

**10.** Plaintiffs' argument falls on its own weight. The logical extension of their position is that, if no General Order existed to the contrary, a deranged Chief could "deploy" his investigators to use a rack and screw in conducting interrogations and the City would be liable under section 1983. A General Order prohibiting torture is not required to demonstrate that the Commission does not condone torture.

3. A status conference is hereby scheduled for September 1, 1993, at 8:30 a.m.

IT IS SO ORDERED.